Daniel J. Hurteau
dhurteau@nixonpeabody.com
Erin T. Huntington
ehuntington@nixonpeabody.com
**NIXON PEABODY LLP**
677 Broadway, 10th Floor
Albany, NY 12207
Phone: 518-427-2650
Fax: 518-427-2666

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL P. GOODMAN,<br><br>Plaintiff,<br><br>- against -<br><br>GILA GOODMAN, a/k/a Gila Dweck, a/k/a Gila Dabah, Jane Doe 1 through 20,<br><br>Defendant. | **SECOND AMENDED COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>**<br><br>Case No. 1:21-cv-10902 |

Michael P. Goodman ("Mr. Goodman" or "Plaintiff") by and through his attorneys NIXON PEABODY LLP, hereby amends his Verified Complaint against Defendant Gila Goodman a/k/a Gila Dweck, a/k/a Gila Dabah ("Ms. Goodman" or "Defendant") as follows:

## INTRODUCTION

1. During the parties' ongoing divorce proceeding, Ms. Goodman deliberately hacked into Mr. Goodman's personal computer to repeatedly view and download his personal data, including attorney-client communications with his divorce attorneys.

2. Ms. Goodman then attached dozens of private emails in her submissions to the New York County Supreme Court during the divorce proceeding.

3. Ms. Goodman was So-Ordered on November 17, 2020, by the New York County Supreme Court to turn over all of her computing devices and those of her agents.

4. She only eventually began to partially comply on December 2, 2020.

5. Ms. Goodman made multiple copies of all the contents on Mr. Goodman's personal computer and transferred its data, including Mr. Goodman's personal and very confidential information to the Acronis Cloud (a cloud-based data storage account which she had specially set up and financed its cost for this purpose) and also to another laptop and an additional standalone Hard Drive, which she failed to turn over to the Court for several months.

6. The standalone hard drive and multiple other computer equipment has still not been turned over to the Court.

7. When confronted with the evidence of her illegal conduct, Ms. Goodman made a series of false statements initially denying her conduct and then attempting to justify it.

8. A forensic analysis of Mr. Goodman's computer confirmed Ms. Goodman's improper access and use of Mr. Goodman's computer and that her statements regarding the same were demonstrably false.

9. Furthermore, on the afternoon of June 5, 2020, at approximately 4:30 p.m., Ms. Goodman came running down the stairs from her office on the 10th floor down to Mr. Goodman's apartment on the 5th floor, in her high heeled boots, with her iPhone in her hand in recording mode. Ms. Goodman immediately began to listen through the front door to the private conversations that Mr. Goodman was having with his divorce attorney, and then with his Rabbi, while simultaneously putting her iPhone to the door to ensure she could record the complete conversation.

10. Ms. Goodman knelt on the floor so as not to be seen through the glass panel in the center of the door and during the several minutes she spent recording his conversations, she removed her jacket so as to get comfortable.

**THE PARTIES**

11. Michael P. Goodman is an individual residing in the State of New York, County of New York, City of New York.

12. Gila Goodman is an individual residing in the State of New York, County of New York, City of New York.

**JURISDICTION AND VENUE**

13. Jurisdiction of this Court arises under 28 U.S.C. §1331.

14. Jurisdiction of this Court for the *pendent* state claims is authorized by 28 U.S.C. §1367, and arises under the doctrine of *pendent* jurisdiction as set forth in *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).

15. This Court has personal jurisdiction over Ms. Goodman pursuant to New York Civil Practice Law & Rules Sections 301 and/or 302.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Ms. Goodman resides in this judicial district, and a substantial part of the events, omissions, claims, and/or causes of action asserted in this Complaint arose in this district.

**ALLEGATIONS**

17. At all relevant times, Mr. Goodman was the owner of a password protected HP Pavilion All-in-One computer serial number QAC3EN61MSTP00113AD012013 (the "Computer").

18. Mr. Goodman was always the sole owner and user of the Computer.

19. The Computer exclusively contains Mr. Goodman's personal and confidential information and access to all his email accounts.

20. The Computer was only used by Mr. Goodman at the parties' beach home in in Loch Arbour, New Jersey (the "New Jersey Residence").

21. Mr. Goodman last left the New Jersey Residence on March 12, 2020, to return to the parties' former marital residence located at 521 Park Avenue, New York, New York ("Marital Residence").

22. When Mr. Goodman left the New Jersey Residence on March 12, 2020, at about 2:00 p.m., he left the Computer in the master bedroom as he always had done.

23. Ms. Goodman had not served Mr. Goodman with divorce papers at that time nor had she confirmed to Mr. Goodman that she decided that she would.

24. Mr. Goodman had every intention of returning to the New Jersey Residence within a few days to oversee ongoing renovations being made in New Jersey at that time.

25. Before leaving, Mr. Goodman made sure that the Computer was locked to protect his personal files and emails from access by anyone other than himself, as was his invariable habit whenever he left.

26. Approximately one week after he returned to the Marital Residence, on or about March 19, 2020, at 9:00 a.m., Mr. Goodman was served with a Summons and Notice for divorce.

27. After serving Mr. Goodman with divorce papers, Ms. Goodman then immediately left[1] the Marital Residence and went with her personal housekeeper (of twenty years) to the New Jersey Residence.

---

[1] Although Ms. Goodman physically left the Marital Residence, her stated intent was always to return to New York. Her physical presence in New Jersey was a temporary arrangement during the pendency of the Covid outbreak in New York, just as her entire family did.

28. Ms. Goodman was joined at the New Jersey Residence immediately thereafter by her daughter Naomi Dweck and her son-in law Jack Kassin, their two children and two more housekeepers.

29. On Saturday, April 4, 2020, at 10:21 p.m., Ms. Goodman emailed Mr. Goodman asking for permission to use his Computer.

30. Mr. Goodman replied to Ms. Goodman's email by denying her permission to use his Computer, and offering instead to provide a new computer for Ms. Goodman to use.

31. On May 27, 2020, Ms. Goodman submitted an affidavit as part of their ongoing divorce proceeding to the New York County Supreme Court to which she attached copies of Mr. Goodman's private emails.

32. Since Mr. Goodman had not shared these emails with Ms. Goodman, there was no explanation for how Ms. Goodman obtained Mr. Goodman's emails.

33. On May 28, 2020, at 12:32 a.m. (after midnight) when Mr. Goodman received Ms. Goodman's Emergency Affidavit in the divorce proceeding by email, and request for a Temporary Restraining Order, together with his private emails attached as exhibits, Mr. Goodman was first alerted to the likelihood that Ms. Goodman had improperly hacked into and accessed his Computer.

34. Mr. Goodman shortly thereafter demanded via his attorney that Ms. Goodman return the Computer to him.

35. On June 8, 2020, at 9:04 p.m., Ms. Goodman's attorney sent an email to Mr. Goodman's attorney stating, "Listen Dan. The computer is where he left it unlike your client who stole her bags. I'm not discussing his computer until after we are done with all of this. And given how hot to trot he is to get his computer we'll have to sign a separate stip about it."

36. In a June 16, 2020, eight-page letter sent by email, Ms. Goodman *via* her attorneys stated "Following the parties' separation, Ms. Goodman turned the computer off." (The separation was on March 19, 2020).

37. Several weeks later, on or about June 24, 2020, Ms. Goodman finally returned the Computer but neglected to provide its power supply unit, and so the Computer was inoperable.

38. On June 29, 2020, (approximately one month after the first request for the return of the Computer) Ms. Goodman finally returned the Computer's power supply and the Computer was finally able to be powered on.

39. Mr. Goodman immediately sent the Computer over to a computer forensic examiner, without attempting to turn it on.

40. The subsequent analysis by the forensic examiner revealed that Ms. Goodman had improperly and repeatedly accessed the Computer and, more importantly, Mr. Goodman's private email communications and other information.

**Evidence of Ms. Goodman's Unauthorized Access of the Computer**

41. Ms. Goodman claimed *via* her attorneys that she turned the Computer off and that it had remained powered off until it was delivered to Mr. Goodman.

42. These statements were flat out false.

43. The Computer was powered on and fully operational from March 19, 2020 to June 23, 2020.

44. The Computer was, in fact, consistently used by Ms. Goodman and several of those acting on her behalf throughout most of this time period.

45. The Computer was not used by Mr. Goodman, and the forensic evidence indicates that it was accessed by an unauthorized user during this time period.

46. The only person who could have accessed the Computer during this time was Ms. Goodman, or those acting on her behalf.

47. The evidence of this unauthorized and improper usage is overwhelming.

48. The most obvious evidence of unauthorized access is that the password to the Computer was changed, as it was on all the other computers that Ms. Goodman had hacked into.

49. In forensic computer parlance, this is known as a "password replacement attack" which can be accomplished by a number of freely available tools on the internet.

50. Due to the changes that were made to the Computer's password while in Ms. Goodman's custody and control, Mr. Goodman would not have been able to access the Computer himself after it was finally returned to him even if he had tried to.

51. There were also several "third-party utilities" including "ostpstviewer.exe," "outlookviewer.exe," and "kerneloutlookpstviewer.exe" illegally installed and run on the Computer.

52. These were persistent attempts to access Mr. Goodman's Outlook email containers stored on the local hard drive of the Computer.

53. Moreover, a number of devices had been attached to the Computer to ex-filtrate data.

54. On or about June 15, 2020, data was extracted from the Computer on three separate occasions in the following sizes: 12.9 gigabytes, 28.3 gigabytes, 20.1 gigabytes, respectively.

55. Following these extractions, an "uninstaller" program was run on the Computer.

56. This uninstallation program was an attempt to conceal the installation and use of the illegal software used to extract the data.

57. There were also several, non-automatic, actions performed by the Computer as follows:

a. On April 25, 2020, Ms. Goodman visited the login page for a Nest camera system, and the Chase banking website (where Mr. Goodman banks solely in the USA);

b. On April 26, 2020, Ms. Goodman performed a search for "icloud login" and then two seconds later visited the Apple iCloud website;

c. On April 27, 2020, Ms. Goodman attempted to gain access to Mr. Goodman's individual personal Sotheby's Account;

d. On May 3, 2020, Ms. Goodman visited the login page for a New Jersey Appeal Filing System, and also the website of Robin Zendell & Associates (which she would have only known to visit after having read Mr. Goodman's private business emails between him and Ms. Zendell);

e. On May 4, 2020, Ms. Goodman visited a "Launch Meeting" page on Zoom, and used the Delaware Courts' website to view legal filings related to Case No. 65,2013 involving Gila Dweck (Ms. Goodman's first husband's name);

f. On June 16, 2020, Ms. Goodman visited various websites offering software solutions for viewing Microsoft Outlook email archive files, and downloaded a number of programs (one such program, 4Team, was paid for by credit card on-line, downloaded, and run on the Computer);

g. On June 16, 2020, Ms. Goodman visited a partially-filled "Divorce Intake Form" on the legal case management website MyCase, and filled out the "Full Name" field as "Michael Goodman"; and

h. On June 16, 2020, Ms. Goodman visited an invoice summary page for "Neil Stacy Audio Video" – a network equipment installation company.

58. There is overwhelming evidence that a persistent and deliberate effort was made to access Mr. Goodman's emails, contacts, and appointments.

59. Further, Ms. Goodman's statements regarding when the Computer was shut down, and that it remained powered off, are totally false.

60. Ms. Goodman also created several backup copies of a substantial amount of data from the Computer prior to returning it to Mr. Goodman.

61. Ms. Goodman actively attempted to obtain, and succeeded in obtaining, Mr. Goodman's emails, including his attorney-client privileged emails.

62. Beyond the record of Ms. Goodman's access to Mr. Goodman's attorney-client communications evidenced on the Computer, the fact that Ms. Goodman had Mr. Goodman's email "Log In" credentials which she obtained from inside his Microsoft Outlook account means that she had the ability to read *all* of his email communications from any device she chose to use.

63. Upon information and belief, Ms. Goodman continued to intercept, access, download, or otherwise improperly observe Mr. Goodman's email and other electronic communications through November 2020 when Mr. Goodman was finally able to have his email service provider in London successfully change his Exchange Server Log In credentials and passwords.

64. Upon information and belief, Ms. Goodman actively monitored, accessed and intercepted Mr. Goodman's communications in order to obtain information that she believed would help her gain an advantage in their ongoing divorce proceeding.

65. Ms. Goodman's stolen access to the Outlook Exchange Server meant that she could, and upon information and belief did, access Mr. Goodman's emails before they were synched to any of his devices.

66. Upon information and belief, Ms. Goodman accessed, read, and/or downloaded privileged email communications before they were even opened or read by Mr. Goodman.

67. Upon information and belief, Ms. Goodman also deleted a number of emails thereby preventing Mr. Goodman from ever receiving them in the first place.

68. Ms. Goodman later introduced, as exhibits in her multiple submissions to the Court in the divorce proceeding, a substantial number of Mr. Goodman's emails that she had illegally obtained from his Computer and other devices.

69. Ms. Goodman also shared these improperly obtained and private records of Mr. Goodman to several third parties without authorization.

70. The passwords to several of Mr. Goodman's computing devices in the New Jersey Residence had also been changed, evidencing further hacking by Ms. Goodman – and Ms. Goodman has admitted as much in the parties' divorce proceeding.

71. On May 14, 2020, Mr. Goodman received an alert on his iPhone that someone was attempting to sign into his Apple iMac Computer, in the New Jersey Residence as well as his personal Apple iCloud account.

72. Ms. Goodman improperly accessed Mr. Goodman's password-protected iPad (left by his bedside in the New Jersey Residence) and deleted several photos of injuries she had personally inflicted upon Mr. Goodman over the years, from his iPad and from his personal Apple iCloud account.

73. Ms. Goodman also deleted from Mr. Goodman's iPad and Apple iCloud Account, numerous photos Mr. Goodman had taken of over the last few years of small clear plastic water bottles that Ms. Goodman had filled with vodka and hidden in her bedroom closet, bedside table, office desk drawers, office freezer, and other places.

74. In the Supreme Court Order of November 17, 2020, Ms. Goodman was to produce all original copies of Mr. Goodman's papers that she had in her possession. She did not fully comply.

75. Ms. Goodman produced only 204 pages of physical printouts that she had stolen and copied from Mr. Goodman's Computer, together with a 1 TB standalone hard drive.

76. Notably, Ms. Goodman did not produce documents that she later attempted to introduce as purported evidence of a fraudulent post-nuptial agreement in the parties' ongoing divorce proceeding.

77. The 1 TB hard drive, prepared and produced by Ms. Goodman's attorneys, included over 350,000 stolen emails, and the "ostpstviewer.exe" software purchased to successfully steal all of Mr. Goodman's emails and copy them all to both her Acronis Cloud account and at least one of her own laptops.

78. On February 16, 2022, during a hearing in the parties' divorce action, Ms. Goodman produced even more documents that she could have only obtained from the Computer but which she had not previously disclosed.

**Ms. Goodman Was Never Given Permission to Access the Computer or View Mr. Goodman's Personal Information and Communications**

79. Mr. Goodman never authorized Ms. Goodman to use or access his Computer or iPad, and his personal data and information, or to monitor, record, delete, or otherwise access in any way his private communications.

80. Ms. Goodman's access to his Computer, Outlook email Exchange Server, iPad, and Apple iCloud Photo storage was done entirely without Mr. Goodman's knowledge, permission or authorization.

81. Ms. Goodman's installation of third party utilities onto the Computer and exfiltration of data was done entirely without Mr. Goodman's knowledge, permission or authorization.

82. Ms. Goodman's accessing, monitoring, downloading and/or copying of electronic communications, email messages, calendar items, contracts, passwords, documents, and other information surreptitiously taken from the Computer was done entirely without Mr. Goodman's knowledge, permission, or authorization.

83. The Computer was, at all times relevant hereto, connected to the Internet, and was used in interstate commerce.

84. Ms. Goodman, while accessing the Computer and/or other computing devices to access, view, and download Mr. Goodman's electronic communications and other personal information, then accessed, intercepted, monitored or otherwise observed, without authorization and/or in excess of authorization, an unknown number of electronic communications, and personal information stored or maintained on Mr. Goodman's email accounts and on the Computer's database.

85. Ms. Goodman, after accessing the Computer, transmitted each and every electronically stored file, identified above, from the Computer to her newly purchased but "refurbished" Dell laptop via the Acronis Cloud network account that she created and paid for by credit card.

86. Ms. Goodman accessed, trespassed upon, obtained, stole, and converted a substantial but as yet undetermined amount of electronic files belonging to Mr. Goodman, including but not limited to private, confidential and privileged communications with his attorneys in both the USA and UK.

87. When confronted with this evidence, Ms. Goodman made a number of further false statements in an attempt to conceal her actions.

**"Shared Computer" Excuse**

88. In an affidavit submitted to the New York County Supreme Court on or about May 21, 2021, Ms. Goodman admitted accessing and using the Computer between March 19, 2020 and May 8, 2020 to "prepare inventories of our marital collections of jewelry, art[,] and valuables[.]"

89. Ms. Goodman and her attorneys claimed repeatedly in multiple affidavits and affirmations that the Computer was a "shared computer" and that she had used it prior to March 19, 2020.

90. Based on Mr. Goodman's personal knowledge and the forensic analysis performed on the Computer, Ms. Goodman's statement that she had used the Computer prior to March 19, 2020 is totally false.

91. The Computer was also never a "shared" computer.

92. In fact, Mr. Goodman previously set up a different computer exclusively for Ms. Goodman to use on the third floor of the New Jersey Residence instead of the HP All-In-One Computer (which was only for Mr. Goodman's use), and Ms. Goodman did use this other computer for all her own purposes on multiple prior occasions and especially in 2019.

93. In support of her feeble excuse, Ms. Goodman asserted that she had a PIN to the Computer, which she used to access it.

94. While Ms. Goodman did eventually access the Computer using a PIN (according to her), she did not obtain it legally or from Mr. Goodman.

95. Mr. Goodman never gave Ms. Goodman any PIN number nor any other means of accessing his Computer.

96. Rather, she asked her son-in-law Jack Kassin to hack into the Computer.

97. Ms. Goodman's son-in-law Jack Kassin is a self-professed 'computer guru' whom Ms. Goodman had previously turned to for assistance in improperly accessing Mr. Goodman's files without his permission.[2]

98. Sometime afterwards, in early 2021, Mr. Kassin contacted Mr. Goodman and confirmed that Ms. Goodman had asked him if he could get into the Computer because she had no access to it.

99. Mr. Kassin reported that he knew it was Mr. Goodman's personal computer, and that he was concerned that he would be committing a crime if he hacked into the Computer.

100. Ms. Goodman reportedly told him that she had discussed it with her lawyers and that since the Computer was in the "Marital Bedroom" she had a legal right to access it.

101. So, Mr. Kassin asked Ms. Goodman if she knew the password.

102. She told him that she did not, but that she could (and did) provide him with a list of passwords and later on, a list of number combinations that Mr. Goodman had used in the past for other activities.

[2] In or about August 2015, Mr. Goodman visited London for about one month. When Mr. Goodman returned from London, Ms. Goodman's son-in-law Jack Kassin had changed the passwords to several of his devices including the routers and WiFi networks in his New Jersey residence. During that time, Ms. Goodman also accessed Mr. Goodman's late father's testament and letter of his wishes which was all marked Strictly Private & Confidential and she photographed all this private information.

103. Mr. Kassin used a "Brute Force" password attack, where the attacker tries a list of common or likely passwords or PIN codes.

104. None of the passwords provided by Ms. Goodman worked.

105. However, Mr. Kassin claimed that he noticed that the Computer's PIN Sign On feature could be enabled, but had previously not been enabled.

106. According to Mr. Kassin, he then started entering every numeric password that he was provided with by Ms. Goodman as a PIN number, which Ms. Goodman knew Mr. Goodman had used in the past and currently on other accounts, until he found one that worked.

107. As a result, Ms. Goodman was thereafter able to, and did, unlock the Computer using the PIN, according to Mr. Kassin.

**"Smart Home Surveillance" Excuse**

108. Ms. Goodman also tried to justify her actions by claiming that Mr. Goodman had remotely logged into the Computer to harass Ms. Goodman by manipulating their smart-home devices.

109. Ms. Goodman admitted that, on or about May 10, 2020, she hired a computer expert to "assist me and Jack [Kassin] in regaining[3] access to the [Computer.]"

110. She claimed that afterwards, "[o]n or about June 15, 2020, my son-in-law (Jack Kassin) uploaded a backup copy of the [Computer]" to the cloud and that "[i]n order to protect his own family from [Mr. Goodman's] surveillance, he also saved [Mr. Goodman's] emails [over 350,000] to his own computer to preserve proof of alerts sent to [Mr. Goodman's] email when [Mr. Goodman] was remotely accessing smart home features."

---

[3] It appears that at some point between March 19, 2020 to June 23, 2020, Ms. Goodman tripped over the power cable causing the Computer to crash. Thereafter, Ms. Goodman needed to hack into the computer again to "regain" access.

111. Mr. Kassin informed Mr. Goodman that one of the first things he did when he accessed the Computer was to cut off the three various ways that he thought that Mr. Goodman could gain remote access to the Computer.

112. However, Ms. Goodman's claim is demonstrably false for multiple reasons.

113. There is not a single smart home email alert in Mr. Goodman's emails.

114. The smart home system could only be controlled through the mobile application, e.g.: a cell phone or iPad type of device, and not through the Computer.

115. Ms. Goodman had all of the smart home features disconnected from the internet upon her arrival at the New Jersey Residence on March 19, 2020, by her nephew, Steven Dabah, the youngest son of her eldest brother Haim Dabah, who lives opposite her in New Jersey.

**Ms. Goodman Attempts to Hide Evidence of Her Hacking**

116. On or about November 17, 2020, the New York County Supreme Court So-Ordered Ms. Goodman to turn over all her computing devices, including both fixed and portable hard drives, as well as any information relating to "her purchase and/or use of any program, software, or modality, used by [Ms. Goodman], or at her direction or authorization, to obtain [Mr. Goodman's] communications and information without his knowledge or authorization."

117. On December 14, 2020, Ms. Goodman's attorneys falsely represented to the New York Supreme Court judge presiding over their divorce proceeding that she had fully complied with the Court's order on December 1, 2020.

118. Ms. Goodman only partially complied on December 2, 2020 by providing some of her devices – some two weeks later, allowing herself plenty of time to delete and cleanse her computer of anything she did not want the court to see of find.

119. On December 2, 2020, just after 5:00 p.m., Mr. Goodman also observed in the street, Ms. Goodman and her assistant, Sylvia Wang, carrying a large desktop computer out of Ms. Goodman's home office (jointly owned by the parties).

120. On January 26, 2021, at 5:00 p.m., the New York County Supreme Court allowed Mr. Goodman to make a one-hour inspection of Ms. Goodman's home office.

121. During that visit Mr. Goodman observed multiple computing devices, including a small desk size file server that was network connected and sat on her own desk, that Ms. Goodman should have handed over to her attorneys pursuant to the Court's November 17, 2020, order.

122. On or about February 21, 2021, Mr. Goodman learned that Ms. Goodman had withheld another computer when she was So-Ordered to turn in all computing devices.

123. On or about February 26, 2021, Mr. Goodman learned that Ms. Goodman purchased two Dell laptops in or about April 2020 and May 2020, respectively.

124. Upon information and belief, the April 2020 laptop was purchased for Ms. Goodman's assistant, Sylvia Wang, and as an agent of Ms. Goodman, it still has not been handed in to her attorney's office as of this day, as So-Ordered by the New York County Supreme Court on November 17, 2020.

125. Upon information and belief, the May 2020 laptop (the "Laptop") was exclusively purchased with the intent to download the contents of the Computer before Ms. Goodman returned it to Mr. Goodman.

126. To explain her prior failure to turn over the Laptop, Ms. Goodman's counsel stated that the Laptop now belonged to Mr. Kassin.

127. Ms. Goodman's counsel stated that Ms. Goodman had previously borrowed the Laptop to use for a short period of time and that her emails were "inadvertently" synchronized to

the Laptop (although in a later submission to the Court Ms. Goodman stated that she authorized her assistant to export her emails to the Laptop).

128. This was another patently false statement, as Mr. Kassin had to obtain the password to unlock the Laptop from Ms. Goodman as he did not know it himself.

129. In fact, Ms. Goodman personally gave the Laptop to Mr. Kassin to "hide" so she could avoid handing it in to the Court.

130. Subsequently, in the parties' divorce proceeding, Ms. Goodman then claimed it was Mr. Kassin's idea to export 350,000 files from the Computer to the Acronis Cloud.

131. On or about April 12, 2021, pursuant to a So-Ordered Subpoena, Mr. Kassin eventually turned the Laptop over to the New York County Supreme Court, where it currently remains.

132. At the same time, Ms. Goodman demanded that all of her emails should be wiped from the Laptop by her own attorneys before any examination was conducted.

133. On August 26, 2021, at 2:50 p.m., Mr. Goodman saw the Super of Ms. Goodman's home office building and another individual, loading up a car with multiple servers, computers, etc., which he recognized all came from Ms. Goodman's home office in #10A.

134. The Super informed Mr. Goodman that Ms. Goodman had instructed him to remove the computing devices, from her home office that she gave him, and take them especially to a recycling plant, which is exactly what he was doing.

135. Among the devices being ostensibly destroyed was Ms. Goodman's former email server from 2005 to 2015, identified as evidence in the parties' divorce proceedings.

136. Ms. Goodman claimed after the fact that the server was a "design server" rather than an email server.

137. Ms. Goodman's actions reveal her attempts to hide the most incriminating evidence of her own orchestrated hacking of the Computer and spoliation of all evidence needed in the matrimonial matter.

**Ms. Goodman Records Mr. Goodman's Phone Calls**

138. At or about 4:30 p.m. on June 5, 2020, Ms. Goodman went up to the front door of the Marital Residence where Mr. Goodman resides with her phone in her hand.

139. She immediately stood to the side of the door frame, so that she was not visible to anyone inside the apartment through the door's central window pane.

140. Ms. Goodman thereafter knelt down next to the door and began recording with her phone.

141. Ms. Goodman remained kneeling at Mr. Goodman's front door for almost three minutes whilst recording, even taking her jacket off in the process.

142. Inside the apartment during this time, Mr. Goodman had at least two separate phone conversations.

143. One phone call was with his attorney of record in his ongoing divorce proceeding.

144. Another phone call was with his Rabbi discussing, *inter alia*, his ongoing divorce proceeding.

145. Mr. Goodman was pacing during these phone calls, walking back and forth in the gallery of his apartment including right up to his front door.

146. Upon information and belief, Mr. Goodman's phone conversations were audible through the front door.

147. In fact, Ms. Goodman later that same day actually called Mr. Goodman's Rabbi and asked him he had had a conversation earlier with Mr. Goodman, and told him not to believe a word Mr. Goodman said.

148. Ms. Goodman also contacted Mr. Goodman's therapist in case it was him with whom Mr. Goodman was speaking.

149. At all times, Mr. Goodman was unaware of Ms. Goodman's presence on the other side of his front door as she was kneeling out of sight while recording his phone calls.

150. The New York State Supreme Court's November 17, 2020 Order required Ms. Goodman to turn over her "iPhone(s), as well as any such computing devices [that] hold or held communications and information belonging to [Mr. Goodman] and that were obtained by [Ms. Goodman] herself…without [Mr. Goodman's] knowledge or authorization."

151. Upon information and belief, Ms. Goodman never turned over the phone she used to record his private, privileged, and confidential conversations.

**FIRST CAUSE OF ACTION**
**(Violation of the Computer Fraud and Abuse Act - 18 U.S.C. § 1030)**

152. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

153. The Computer is a "protected computer" pursuant to Section 1030(e)(2) of the Computer Fraud and Abuse Act ("CFAA").

154. As detailed above, Ms. Goodman knowingly and intentionally accessed the Computer without authorization or exceeded authorized access to the Computer, or caused others to access the Computer without authorization or exceeded authorized access to the Computer, and thereby obtained information from the Computer, in violation of 18 U.S.C. §1030(a)(2), which has

a value exceeding five thousand dollars ($5,000.00) in a one-year period, in violation of 18 U.S.C. § 1030(a)(4).

155. Ms. Goodman intended to deceive Mr. Goodman of her unauthorized access to the Computer by, *inter alia*, downloading an "uninstaller program" to hide evidence of her access; failing to turn over the Computer and her other computing devices in violation of court orders; and offering multiple demonstrably false excuses for her access.

156. Mr. Goodman was not aware of Ms. Goodman's intentional and unauthorized access of the Computer until May 28, 2020, at the earliest.

157. Ms. Goodman's actions to unlawfully access the Computer and Mr. Goodman's email and other communications gave her access to attorney-client privileged communications regarding, *inter alia,* the very divorce proceeding she and Mr. Goodman were engaged in.

158. The information that Ms. Goodman obtained included Mr. Goodman's private emails which she later introduced as evidence in their divorce proceeding for her own gain and to Mr. Goodman's detriment; information regarding Mr. Goodman's personal finances and assets, to which she would otherwise not have been privy, in order to seek a larger share of Mr. Goodman's **imagined** wealth through their divorce proceeding; and deleted photographs and media files evidencing her abuse of Mr. Goodman which would have adversely impacted her in their ongoing divorce proceeding.

159. Ms. Goodman's access to the Computer exceeded her authorization.

160. Ms. Goodman through her actions in violation of 18 U.S.C. § 1030(a)(2) and (a)(4), caused Mr. Goodman to incur losses for investigating and responding to Ms. Goodman's unauthorized access and hacking (cost of forensic analysis) as well as additional legal and court fees incurred in the divorce proceeding that were considerably extended a direct result of Ms.

Goodman's unauthorized access and hacking of the Computer exceeding five thousand dollars ($5,000.00) during a one-year period in violation of 18 U.S.C. § 1030(g) and (c)(4)(A)(i)(I); the investigation of such losses continues.

161. The damage and injuries to Mr. Goodman occurred in New York City.

162. Mr. Goodman has been damaged as a proximate result of Ms. Goodman's despicable acts and wanton breach of trust.

163. In addition to an award of compensatory damages, Mr. Goodman is also entitled to attorney's fees for this action and punitive damages as Ms. Goodman's actions were conscious, intentional, wanton, malicious, and criminal.

**SECOND CAUSE OF ACTION**
**(Violation of Electronic Communications Privacy Act – 18 U.S.C. § 2510, *et seq.*)**

164. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

165. Through her repeated access and monitoring of Mr. Goodman's email account, Ms. Goodman intentionally and contemporaneously intercepted and/or endeavored to intercept electronic communications transmitted to from the Computer and/or Mr. Goodman's Microsoft Outlook email account, including private and/or privileged two-way communications between Mr. Goodman and his attorneys, his therapist, and his personal Rabbi.

166. Upon information and belief, Ms. Goodman actively monitored, accessed and intercepted Mr. Goodman's communications in order to obtain information that she believed would help her gain an advantage in their ongoing divorce proceeding.

167. Ms. Goodman's access to the Outlook Exchange Server meant that she could, and upon information and belief did, access Mr. Goodman's emails before they were synched to any of his devices.

168. Upon information and belief, Ms. Goodman accessed, read, and/or downloaded privileged email communications before they were even opened or read by Mr. Goodman.

169. Upon information and belief, Ms. Goodman also deleted a number of emails thereby preventing Mr. Goodman from ever receiving them in the first place.

170. Upon information and belief, Ms. Goodman disclosed or endeavored to disclose the content of the electronic communications that she unlawfully intercepted or otherwise obtained through her illegal access to the Computer for her own benefit and to Mr. Goodman's detriment including in their ongoing divorce proceeding.

171. Upon information and belief, Ms. Goodman used or endeavored to use the content of the electronic communications that she unlawfully intercepted or otherwise obtained through her illegal access to the Computer for her own benefit and to Mr. Goodman's detriment including in their ongoing divorce proceeding.

172. Additionally, on or about June 5, 2020, Ms. Goodman approached the front doorway of Mr. Goodman's apartment.

173. For nearly three minutes, she sat crouched at the doorway with her iPhone held closely to the door and recorded his private, confidential, and/or privileged conversations with his divorce attorney and/or his Rabbi.

174. Ms. Goodman angled the iPhone's microphone at the doorway, intentionally and contemporaneously intercepting and/or endeavoring to intercept private, confidential, and/or privileged oral communications between Mr. Goodman and his divorce attorney and/or his Rabbi.

175. Ms. Goodman's actions were without consent of or knowledge by Mr. Goodman.

176. Upon information and belief, Ms. Goodman intentionally and contemporaneously intercepted and/or endeavored to intercept such communications in order to obtain information that she believed would help her gain an advantage in their ongoing divorce proceeding.

177. Ms. Goodman's conduct was a violation of the Wiretap Act.

178. Section 2520 of the Wiretap Act provides for civil liability.

179. Mr. Goodman is entitled to recover his damages, in an amount to be determined, resulting from Ms. Goodman's intentional interception, use and/or disclosure of communications.

180. Mr. Goodman is entitled to statutory damages of $100 per day for each day that Ms. Goodman violated the Wiretap Act or $10,000, whichever is greater.

181. Mr. Goodman is entitled to punitive damages, in an amount to be determined, for Ms. Goodman's egregious, malicious and oppressive actions intentionally and specifically done to intercept and/or record, among other things, communications between Mr. Goodman and his attorneys, his therapist and personal Rabbi.

182. Mr. Goodman is entitled to recovery of his attorney fees and costs of this litigation.

183. Mr. Goodman is entitled to a declaration that Ms. Goodman's actions alleged herein violated the Wiretap Act.

## **THIRD CAUSE OF ACTION**
## **(Violation of the Stored Communications Act, 18 U.S.C. §2701, et seq.)**

184. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

185. During all relevant times, Mr. Goodman was a person within the meaning of 18 U.S.C. § 2707(a).

186. Emails and other internet messages are electronic communications under the Stored Communications Act of 18 U.S.C. § 2701.

187. Mr. Goodman's Microsoft Outlook webmail account Exchange Server and other internet messaging account servers and/or networks are facilities through which said electronic communications are transmitted within the meaning of the Stored Communications Act of 18 U.S.C. § 2701.

188. Mr. Goodman's Microsoft Outlook webmail account Exchange Server and other internet messaging accounts, as well as the other applications on the Computer maintain the above-described electronic communications in electronic storage.

189. Mr. Goodman's communications transmitted through his Microsoft Outlook webmail account and other internet messaging accounts are not accessible to the general public.

190. Ms. Goodman's access to the Outlook Exchange Server meant that she could, and upon information and belief did, access Mr. Goodman's emails before they were synched to any of his devices.

191. Upon information and belief, Ms. Goodman accessed, read, and/or downloaded privileged email communications before they were even opened or read by Mr. Goodman.

192. Upon information and belief, Ms. Goodman also deleted a number of emails from the Outlook Exchange Server thereby preventing Mr. Goodman from ever receiving them in the first place.

193. Ms. Goodman's actions, as alleged herein, violated 18 U.S.C. § 2701(a) by intentionally accessing Mr. Goodman's opened and unopened e-mails and/or internet messages, through her unauthorized access to Mr. Goodman's Microsoft Outlook webmail account Exchange Server, network, and/or system *via* the Computer and other devices utilizing Mr. Goodman's account credentials which were improperly obtained without authorization and thereby obtaining,

altering or preventing authorized access to wire or electronic communication for the purpose of economic advantage, malicious destruction and damage.

194. As a result of Ms. Goodman's actions, she is liable to Mr. Goodman for damages, punitive damages, costs and attorney fees, as authorized by 18 U.S.C. § 2707.

**FOURTH CAUSE OF ACTION**
**(Trespass to Chattels – New York)**

195. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

196. In New York, the elements of a claim for trespass to chattels are:

a. Defendant intentionally and without justification or consent, physically interfered with the use and enjoyment of personal property in the plaintiff's possession; and

b. the plaintiff was harmed thereby.

197. Ms. Goodman without justification and without Mr. Goodman's consent interfered with the use of the Computer and access to Mr. Goodman's personal data and information.

198. Both the Computer and the data accessed by Ms. Goodman, including Mr. Goodman's email account and other internet messages, are the personal property of Mr. Goodman.

199. Mr. Goodman was damaged as a result of Ms. Goodman's actions as he was deprived of the use of the Computer for a substantial period of time while it was in her possession, and the possession of the forensic examiner where it remains.

200. Mr. Goodman was also damaged as a proximate result of Ms. Goodman's trespass by virtue of her hacking into and illegally downloading and/or copying the contents of his private information and data, and because a substantial but as-of-yet undetermined number of electronic

files were copied, captured or otherwise taken from the Computer, without Mr. Goodman's knowledge or consent, and thereby, Mr. Goodman has been deprived of the same.

201. Mr. Goodman has also been damaged as a proximate result of Ms. Goodman's unauthorized access to, and subsequent deletion of photographs from, Mr. Goodman's Apple iCloud account.

202. Ms. Goodman's actions were conscious, intentional, wanton, malicious and criminal, entitling Mr. Goodman to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Civil Conversion – New York)**

203. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

204. In New York, the elements of a claim for civil conversion are:

a. the willful interference with property;

b. without lawful justification; and

c. whereby a person entitled to possession of the property is deprived of the possession of it.

205. Ms. Goodman willfully interfered with the use of the Computer, and willfully interfered with Mr. Goodman's electronic files, data and other information by virtue of her improper access to the Computer.

206. Ms. Goodman's willful interference was without lawful justification.

207. In doing so, Ms. Goodman deprived Mr. Goodman of possession of a substantial but as-of-yet undetermined number of his electronic files.

208. Upon information and belief, Ms. Goodman not only copied and downloaded data from the Computer, but deleted and/or removed an as-of-yet undetermined number of his electronic files and data.

209. Mr. Goodman has been damaged thereby.

210. Mr. Goodman has also been damaged as a result of Ms. Goodman's unauthorized access to, and subsequent deletion of photographs from, Mr. Goodman's Apple iCloud account.

211. Ms. Goodman's actions complained of, herein, were conscious, intentional, wanton, malicious and criminal, entitling Mr. Goodman to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Fraud)**

212. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

213. Ms. Goodman has made a series of misstatements to Mr. Goodman and the Court regarding her access and use of the Computer and his private and confidential information including, *inter alia*, that she turned off the Computer upon her arrival to the New Jersey Residence; that the Computer remained off the entire time it was in her possession; that the Computer was a "shared computer"; that she accessed the Computer to prevent Mr. Goodman from accessing the smart home equipment; that her Laptop belonged to Mr. Kassin; and that her emails had inadvertently synced to the Laptop.

214. Ms. Goodman further misrepresented that she had complied with the New York State Supreme Court's November 17, 2020 Order when she failed to provide the June 5, 2020 recording of Mr. Goodman's private, confidential, and/or privileged conversations with his divorce attorney and/or rabbi on her iPhone.

215. These representations were material, false, and Ms. Goodman knowingly and intentionally made such misrepresentations in order to induce Mr. Goodman to rely upon them.

216. Mr. Goodman justifiably relied to his detriment on the truth of Ms. Goodman's representations as the basis for continued communication with his attorneys and others *via* email and telephone during his ongoing divorce proceeding with Ms. Goodman.

217. As a result of Ms. Goodman's fraudulent misrepresentations, Mr. Goodman has suffered, is suffering and/or shall continue to suffer damages in the form of investigating and responding to Ms. Goodman's unauthorized access and hacking (cost of forensic analysis) as well as additional legal and court fees incurred in the divorce proceeding that resulted directly from the revelation of Ms. Goodman's unauthorized access and hacking of the Computer, her illicit recording of his phone conversations, and various other incidental, and consequential damages and expenses in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**(Violation of the New Jersey Computer Related Offenses Act, N.J.S.A. §§ 2A:38A)**

218. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

219. The New Jersey Computer Related Offenses Act ("CROA"), N.J.S.A. §§ 2A:38A-1, et seq., exposes to civil liability whomever causes a "person or enterprise damage[] in business or property" as a result of certain statutorily-enumerated actions, including, without limitation, "[t]he purposeful or knowing, and unauthorized … taking ...... [of] any data…[or] computer" N.J.S.A. 2A:38A-3(a), (b).

220. The CROA also provides for damages for the "unauthorized accessing or attempt to access any computer…" N.J.S.A 2A:38A-3(c).

221. Mr. Goodman's private and confidential information, including his emails and internet messages, constitute "data" within the meaning of N.J.S.A. 2A:38A-3.

222. Ms. Goodman's purposeful and/or knowing access of Mr. Goodman's stored e-mails and/or internet messages, through her unauthorized access to the Computer, as well as through other devices utilizing Mr. Goodman's account credentials which were improperly obtained without authorization have violated the CROA.

223. Ms. Goodman's purposeful and/or knowing and unauthorized access of the Computer has violated the CROA.

224. As a result of Ms. Goodman's actions, Mr. Goodman has suffered, is suffering, and/or shall continue to suffer damages in the form of investigating and responding to Ms. Goodman's unauthorized access and hacking (cost of forensic analysis), additional legal and court fees incurred in the divorce proceeding that resulted directly from the revelation of Ms. Goodman's unauthorized access and hacking of the Computer, as well as emotional distress and mental anguish resulting from the violation of his privacy and Ms. Goodman's use of these communications in their divorce proceeding against him.

225. Mr. Goodman has also suffered damages as a result of being deprived of the use of the Computer for a substantial period of time while it was in Ms. Goodman's possession, and the possession of the forensic examiner where it remains.

226. Upon information and belief, Mr. Goodman has also been damaged as a result of Ms. Goodman's deletion and/or removal of an as-of-yet undetermined number of his electronic files and data.

227. Mr. Goodman has also been damaged as a proximate result of Ms. Goodman's unauthorized access to, and subsequent deletion of photographs from, Mr. Goodman's Apple iCloud account.

228. Mr. Goodman is therefore entitled to damages, costs, and, pursuant to N.J.S.A. § 2A:38A-5.

**EIGHTH CAUSE OF ACTION**
**(Violation of the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. §§ 2A:156A-24, 27)**

229. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

230. Ms. Goodman intentionally and contemporaneously intercepted and/or endeavored to intercept Mr. Goodman's wire communications, electronic communications, or both by hacking into the Computer, and/or causing others to hack into the Computer, without authorization, and thereafter accessing Mr. Goodman's email and other internet messaging accounts using the Computer and/or other devices for her own benefit and to Mr. Goodman's detriment including in their ongoing divorce proceeding.

231. Ms. Goodman did not have authorization or consent to access or view Mr. Goodman's email and other internet messages.

232. Ms. Goodman accessed both older and recent emails sent and received by Mr. Goodman on the multiple occasions that she improperly viewed his electronic communications, including emails and other messages in the course of transmission or as backup to that course of transmission.

233. Ms. Goodman's access to the Outlook Exchange Server meant that she could, and upon information and belief did, access and/or read Mr. Goodman's emails before they were synched to any of his devices.

234. Upon information and belief, Ms. Goodman intercepted Mr. Goodman's communications contemporaneously during their transmission.

235. Upon information and belief, Ms. Goodman accessed, read, mark them as unread and/or downloaded privileged email communications before they were even opened or read by Mr. Goodman.

236. Upon information and belief, Ms. Goodman also deleted a number of emails thereby preventing Mr. Goodman from ever receiving them in the first place.

237. Upon information and belief, Ms. Goodman disclosed Mr. Goodman's private, privileged, and/or confidential emails to several third parties.

238. As a result of Ms. Goodman's actions, Mr. Goodman has suffered, is suffering, and/or shall continue to suffer damages in the form of investigating and responding to Ms. Goodman's unauthorized access and hacking (cost of forensic analysis), additional legal and court fees incurred in the divorce proceeding that resulted directly from the revelation of Ms. Goodman's unauthorized access and hacking of the Computer, and emotional distress and mental anguish resulting from the violation of his privacy and Ms. Goodman's use of these communications in their divorce proceeding against him.

**<u>NINTH CAUSE OF ACTION</u>**
**(Invasion of Privacy – New Jersey)**

239. Mr. Goodman repeats and incorporates by reference the allegations in the preceding paragraphs of this Complaint, as if set forth fully herein.

240. In New Jersey, the elements of a claim for intrusion into seclusion are:

a. an intentional intrusion;

b. into the solitude, seclusion, or private affairs of another;

c. that is highly offensive to a reasonable person.

241. Ms. Goodman intentionally accessed the Computer without authorization, and observed, copied, and/or monitored with Mr. Goodman's electronic files, data and other information.

242. Mr. Goodman had a reasonable expectation of privacy in his email communications and other personal data stored on the Computer and his Apple iCloud account.

243. Ms. Goodman's hacking into the Computer and his Apple iCloud account and interception, observation, and/or copying of Mr. Goodman's private and confidential information, including his email communications, was highly offensive to a reasonable person.

244. Mr. Goodman has been damaged thereby.

**WHEREFORE**, Mr. Goodman, respectfully requests that judgment be entered in his favor and against Ms. Goodman, awarding Mr. Goodman full compensatory damages in an amount to be determined at trial, statutory damages, punitive damages in an amount to be determined at trial, declaratory relief, together with interest, attorneys' fees and costs, together with such other and further relief as this Court deems just and proper.

**Jury Demand**

Mr. Goodman demands trial by jury of all issues so triable.

Dated: May 12, 2022
Albany, New York

**NIXON PEABODY LLP**

By: ______________________________

Daniel J. Hurteau
Erin T. Huntington
677 Broadway, 10th Floor
Albany, New York 12207
(518) 427-2650
dhurteau@nixonpeabody.com
ehuntington@nixonpeabody.com
*Attorneys for Plaintiff Michael P. Goodman*

# VERIFICATION

STATE OF NEW YORK )
) ss.:
COUNTY OF ~~NEW YORK~~ KING )

**Michael P. Goodman**, being duly sworn, deposes and says as follows:

I am the Plaintiff in the above-entitled action. I have read the foregoing ***Second Amended Complaint*** and it is true to the best of my knowledge, except as to matters therein stated to be upon information and belief, and as to those matters I believe them to be true.

Michael P. Goodman

Sworn to before me this
12 day of MAY, 2022

Elena Orosova
Notary Public

Elena Orosova
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01OR6244024
QUALIFIED IN KINGS COUNTY
Commission Expires 06/27/2023



4877-5275-3183.2